ESTATE OF WELDON L. CANFIELD, DECEASED, CENTERRE TRUST COMPANY and JEAN W. CANFIELD, CO-EXECUTORS and JEAN W. CANFIELD, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Canfield v. Commissioner
Docket Nos. 16602-83, 16603-83, 16604-83, 5328-85.
United States Tax Court
T.C. Memo 1987-294; 1987 Tax Ct. Memo LEXIS 294; 53 T.C.M. (CCH) 1082; T.C.M. (RIA) 87294; June 15, 1987. *294 Petitioners-husbands were limited partners of a limited partnership formed to purchase and distribute motion pictures. Respondent disallowed in full petitioners' respective distributive shares of partnership losses, deductions and investment credits, based upon the determination that the activities of the partnership were not engaged in for profit. Respondent also alleged that petitioners were liable for additional interest, because a portion of each of the underpayments determined constitute a substantial underpayment attributable to a tax motivated transaction. Held, the activities of the partnership lack economic substance, and respondent properly has disallowed petitioners' reported losses, deductions and credits with respect to their partnership interests. Rose v. Commissioner,88 T.C. 386 (1987). Held further, the claimed value and basis of the partnership's rights to the movie properties constitute valuation overstatements, within the meaning of sec. 6659(c), I.R.C. 1954, and petitioners' underpayments attributable thereto are subject to the increased rate of interest as substantial underpayments attributable to a tax motivated transaction, within the meaning of sec. 6621(c)(3)(A)(i), *295 as redesignated by the Tax Reform Act of 1986. James F. Nangle, Jr. and Cynthia Nangle Bitting, for the petitioners. Robert J. Foley, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By separate notices of deficiency, respondent determined deficiencies in the Federal income taxes of petitioners as follows: Docket
Notice of
Taxable
No.
Petitioner
Deficiency Date [2]
Year [3] *296 Deficiency
16602-83
Weldon L. Canfield [4]
Mar. 30, 1983
1975
$24,646.00
and Jean W. Canfield
1976
23,617.00
1977
6,115.00
16603-83
James F. Nangle, Jr.
Apr. 20, 1983
1975
24,407.37
and Carole Nangle
1976
20,989.42
1977
6,504.99
16604-83
Samuel J. Goldenhersh
Mar. 31, 1983
1975
54,300.00
and Frieda Goldenhersh
5328-85
James F. Nangle, Jr.
Jan. 3, 1985
1978
6,836.50
and Carole Nangle
1979
2,821.51
1980
2,644.98
1981
2,440.42
Respondent determined by Amended Answer for each docket number listed above, and by Answer for docket No. 5328-85 only, that petitioners also are liable for additional interest under section 6621(c)[5] *297 because a portion of each of the underpayments determined is attributable to a tax motivated transaction. After concessions, [6] the issues remaining for decision are (1) whether petitioners are entitled to deduct their respective distributive shares of partnership losses, interest expenses on nonrecourse notes, depreciation deductions and investment credits [7] arising from their respective interests as limited partners in a limited partnership formed to purchase and distribute motion pictures, and (2) whether a portion of each of the underpayments determined constitutes a substantial underpayment attributable to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and the exhibits attached thereto *298 are incorporated herein by this reference. Petitioners Weldon L. Canfield and Jean W. Canfield, James F. Nangle, Jr. and Carole Nangle, and Samuel J. Goldenhersh and Frieda Goldenhersh, each were husband and wife during the taxable years in issue. Petitioners each filed joint Federal income tax returns for their respective taxable years in issue with the Internal Revenue Service Center in Kansas City, Missouri and resided in Missouri at the time that they filed their respective petitions in this case. Hereinafter, the term "petitioners" shall refer collectively to petitioners Weldon L. Canfield (Canfield), James F. Nangle, Jr. (Nangle), and Samuel J. Goldenhersh (Goldenhersh). [8] At all relevant times Nangle and Goldenhersh were duly licensed to practice law in Missouri. Canfield's occupation was listed as office manager on his 1975 and 1976 returns and "retired" on his 1977 return. The Partnership
During their respective *299 taxable years in issue, petitioners were limited partners in Newton Associates, a New York limited partnership (the Partnership). The term of the Partnership commenced on August 12, 1975, the date of the limited partnership agreement, attached as Exhibit A to the Confidential Descriptive Memorandum discussed below. The term was to continue for approximately 30 years, until December 31, 2005, unless terminated earlier. The certificate of limited partnership, dated August 28, 1975, described the Partnership's business as the ownership and distribution of motion picture films. At all relevant times, the only general partners of the Partnership were Irving Cohen (Cohen) and Ted Shapiro (Shapiro). [9] Cohen was primarily responsible for the Partnership's organization and management. Cohen received a bachelor's degree, and a master's degree in English and Education, from the City University of New York. From 1964 until 1973, he invested in real estate, initially only on his own behalf and later also *300 with partners. His investments included commercial real estate and the rehabilitation of residential complexes and condominiums. In 1973, he became involved in investments in the movie industry. Shapiro worked as an independent financial consultant prior to his association with Cohen. In 1974, Shapiro and Cohen formed ICA Productions Corp. (ICAP), [10] which they intended to be involved in mergers and acquisitions, financial consulting and venture capital projects. Cohen and Shapiro were ICAP's sole principals and shareholders. Through ICAP, Cohen and Shapiro formed several limited partnerships having interests in motion pictures, specifically, 3 in 1974, 12 in 1975 (1 of which is the Partnership in issue) and 1 in 1976. Cohen also organized 10 coal mining tax shelters in 1976 and 1977, and organized and/or was president of the corporation that was a general partner of 80 book publishing tax shelters from 1979 through 1983. ICAP received management fees, of approximately $200,000, from each of the limited partnerships in which Cohen was a general partner. The partnership rather than the corporate form was used because Shapiro believed that the risks of the general partners made *301 the ventures more creditable. Cohen screened and selected each of the movies whose rights were purchased by the Partnership. From 1974 until 1976, he reviewed approximately 10-20 movies per week, a total of over 1,000 potential movies for investment. He viewed an average of one reel of 15-20 minutes' duration for each full-length movie screened. He submitted the movies that he liked to others for their advice and for their opinions with respect to whether the movies could be expected to make money. He did not, however, obtain an appraisal of the fair market values of the movies. Shapiro sought completed movies having mass audience appeal, the costs of which ranged from $1.5-$3 million, and which were not rated "X." Cohen sought investments having a minimum rate of return of 200 percent over a 10-year period. Disclosure Materials
The general partners retained the law firm of Weiss, Rosenthal, Heller & Schwartzman (Weiss, Rosenthal) to assist in the Partnership's formation and its purchase of rights to the movies in 1975. The Partnership's confidential descriptive memorandum, tax opinions and other related materials *302 were prepared and drafted by the law firm to comply with the rules and regulations of the Securities Exchange Commission and to provide the extensive disclosure information required thereby. The Partnership made all reasonable efforts to comply timely with state partnership and securities filing requirements. 1. Confidential Descriptive Memorandum
The limited partnership interests in the Partnership were promoted to prospective investors through an offering document entitled "Confidential Descriptive Memorandum" (the offering memo), dated August 18, 1975. A total of 31 limited partnership units were offered for purchase at $40,000 per unit. Each limited partnership unit represented approximately a 3.0645-percent interest in the Partnership's capital, profits and losses, for an aggregate 95-percent interest. The offering memo stated that the investment was available only to those investors whose net worth was at least $200,000, and some portion of whose current annual gross income was subject to Federal income tax at a rate of 50 percent or higher. The two general partners each made a $1,000 capital contribution to the Partnership and held a 2.5-percent interest in its capital, *303 profits and losses. The Partnership's total capital was $1,242,000, that is, 31 limited partnership units at $40,000 each, plus two general partners' capital contributions at $1,000 each. The offering memo stated that the general partners had prior experience with the acquisition and distribution of motion pictures, principally as organizers and/or general partners of six other limited partnerships engaged in the same type of activities as the Partnership. All of the general partners' prior partnerships were formed between September 1974 and August 1975. The offering memo described each of the three movies that the Partnership expected to acquire, "Dragonfly" also known as "One Summer Love," "Deadly Strangers" also known as "Silhouettes," and "The Martyr," and included a summary of their story lines. The movies' aggregate purchase price was to be $6,175,000, of which a total of $875,000 was to be payable upon their respective closing dates. The balance, $5,300,000, was to be evidenced by long-term, nonrecourse purchase money notes. The offering memo stated that the general partners negotiated the purchase prices of each of the movies with their respective sellers and negotiated *304 the terms of the distribution agreements with each of the movies' distributors. The Partnership's initial expenses included the payment of an organization fee, in the amount of $265,000, to ICAP as organizer of the Partnership. The offering memo stated that a substantial portion of this payment was likely to be paid to other persons as finders' fees. The general partners also received management fees, in the amount of $20,000 each, plus annual compensation, in an amount equal to one percent of the Partnership's cash flow. The offering memo also provided that the Partnership expected to expend an additional $30,000 for legal fees and $7,000 for organizational expenses. The remaining $25,000 of the Partnership's initial capital constituted its working capital reserve. The offering memo stated that it was expected that the movies' sellers would file notices of liens on their movies and on the Partnership's revenue derived therefrom, in accordance with the applicable Uniform Commercial Code provisions. Security agreements, specifically, chattel mortgages, were executed by the Partnership and the movies' sellers but no such security interests were filed with any recording office. The *305 offering memo also stated that there was a substantial degree of risk that the movies' exploitation would not yield profits to the Partnership and its partners, and that the partners might not recoup all or any portion of their partnership capital contributions. It continued that, based upon the terms of the proposed distribution agreements for the three movies, in order for the Partnership to receive sufficient revenue from distributions to satisfy merely the principal amounts of its promissory notes, that is, excluding interest to accrue thereon, the movies would have to generate "distributor's gross receipts" in approximately the following amounts: "Dragonfly" -- $11,000,000; "Deadly Strangers" -- $5,600,000; and "The Martyr" -- $4,150,000. Distributor's gross receipts were defined as gross box office receipts less exhibitors' fees and cooperative advertising expenses, and were acknowledged to be potentially substantially less than total gross box office receipts. The offering memo included a section entitled Tax Factors; approximately one-fourth of the offering memo was devoted to discussions of tax considerations. This section included discussions of certain legislative proposals *306 (as of 1974) to limit deductions to amounts "at risk" in an investment; stated that the Partnership intended to use the income forecast method of depreciation and projected that approximately 88 percent of the depreciation of the movie properties would be deducted in the first 2 years of their initial exhibitions; stated that each partner's basis in the Partnership would include his cash contribution and his proportionate share of partnership liabilities, specifically, the nonrecourse debts to be executed with respect to the Partnership's acquisition of rights to the three movies; and further provided that the movies might be eligible for an investment credit. Its final section, entitled "Possible Impact of Section 183," stated that "no assurance can be given that Section 183 may not be applied in the future to disallow deductions taken by one or more of the individual Limited Partners with respect to their Interest in the Partnership." 2. Tax Opinion
Attached as Exhibit C to the offering memo was the tax opinion rendered by Weiss, Rosenthal. It provided, among other things, that the Partnership intended to acquire the movies for profit-making purposes within the meaning of section 183. *307 It also stated that the Partnership's basis in the movies equaled the purchase prices set forth in each of their acquisition agreements, and that each of the movies was eligible for an investment credit. It concluded, however, that the opinions expressed therein should not be taken as guarantees; the offering memo also warned the prospective investors that opinions of counsel are not binding upon the Internal Revenue Service. 3. Appraisals
Attached as Exhibit D to the offering memo were appraisal letters, all dated in August 1975, with respect to each of the movies. "Dragonfly" and "The Martyr" were reviewed by three people, Joel Preston, Jerome E. Rosenfeld and Leo Pillot, each of whom had more than 25 years of experience in the motion picture industry as of the time of their reviews. "Deadly Strangers" was reviewed by three different people, Nicholas Demetroules, Ralph E. Donnelly and Clayton G. Pantages, each of whom had been involved in the publicity or production of movies but lacked professional experience in movie distribution. The appraisals were based upon reviews of the movies and/or their scripts and distribution agreements. Each appraisal concluded that the Partnership's *308 proceeds to be realized from the distribution of the movies should exceed the movies' respective purchase prices. However, none of the appraisals placed a specific dollar value on the Partnership's rights acquired in any of the movies. 4. Additional Documents
Also attached to the offering memo were copies of the limited partnership agreement, the subscription agreement, summaries of each of the movies' stories, copies of the investors' promissory notes and form letters of credit. Due Diligence
Cohen and Shapiro contacted R. Rowland & Co., Inc. (Rowland), a regional stock brokerage house listed on the New York Stock Exchange, to assist in the solicitation of investors in the Partnership. Cohen contacted James R. Wilcox (Wilcox) to promote investments in the Partnership through private placement offerings. As manager of Rowland's tax shelter department, Wilcox's responsibilities were described as the selection, investigation and marketing of investment opportunities with tax advantages. Wilcox first met Cohen and Shapiro in late 1974 or early 1975. Thereafter, Wilcox met with Cohen and/or Shapiro on approximately 10-15 separate occasions and discussed offerings in the Partnership *309 in issue here and in other limited partnerships formed by Cohen and Shapiro. Wilcox also met with Herman Schwartzman of Weiss, Rosenthal and discussed the tax issues with respect to several movie partnership offerings promoted by Cohen and Shapiro. Wilcox performed the due diligence investigation of the Partnership's investments on behalf of Rowland, as required by regulations of the National Association of Securities Dealers, of which Rowland was a member. He did not have professional experience in the motion picture industry and evaluated the quality and saleability of the movies from his perspective as a lay moviegoer and as an experienced investment advisor and analyst. In the course of his investigation, Wilcox routinely conversed with various attorneys, accountants and other persons involved in the movie industry and film distribution and relied upon their opinions to evaluate whether an economic success would be possible if the Partnership's movies were box-office successes. He also relied upon the appraisals provided by Cohen and Shapiro to evaluate the merit of each movie. Wilcox reviewed the prospectus and private placement offering memoranda to determine whether they *310 fairly disclosed the economic and tax risks of an interest in the Partnership and its movies. He viewed the Partnership's movies "where possible" and reviewed the acquisition and distribution agreements. Wilcox was assisted by Ralph Schaffer, a certified public accountant employed by Rowland, to evaluate the financial projections with respect to the Partnership's interests in its movies. Wilcox's investigation focused upon verifying that each movie existed, that they would be distributed and that there were legal and accounting support for the proposed deductions and reasonable grounds to believe in their economic success and proposed tax benefits. He also attempted to determine whether the Partnership was designed to make a profit and attempted to verify the general partners' net worth. Despite his efforts to verify the sellers' representations of the movies' production costs, Wilcox was unable to verify such representations with respect to the two foreign-made films, "Deadly Strangers" and "The Martyr." Petitioners' Partnership Interests
Each petitioner became aware of the investment opportunity in the Partnership in July or August 1975 through brokers at Rowland. Canfield *311 and Nangle did not have any experience in motion picture distributions or investments prior to their participation in the Partnership. Goldenhersh did not have any direct investment background in the motion picture industry prior to his participation in the Partnership. Canfield was made aware of the investment opportunity in the Partnership through Paul Martin, a broker at Rowland and the father-in-law of one of Canfield's sons. Canfield had transacted business with Rowland for many years prior to 1975 and knew it to be a reputable firm. Prior to his investment, he reviewed the offering memo, appraisals and plot summaries of the movies and was familiar with some of the movies' actors. The investment was presented to Canfield as a good financial investment with favorable tax treatment. Nangle was contacted by Warren Berger, also a broker at Rowland, with respect to an investment in the Partnership. Nangle was familiar with Rowland's reputation and performance, found it to be a reputable brokerage house, and previously had done business through Rowland and Berger. In an initial telephone conversation, Berger explained to Nangle the type of investment and the tax benefits involved *312 in the Partnership, and later explained the investment in the Partnership to him in detail. Before he invested in the Partnership, Nangle read the disclosure materials, including the offering memo, appraisals, plot summaries of the movies, opinion letter and other materials. He did not attempt to acquire appraisals or opinions with respect to the proposed movies' acquisitions, distributions or worth aside from the information provided in the Partnership's disclosure materials. Nangle investigated the rating of the attorney who prepared the opinion letter and found him to have the highest possible rating for performance and integrity, an "a.v." rating, according to the Martindale-Hubbell legal directory. Nangle made clear that he was not interested in, and in fact was morally opposed to, films rated "R" and "X." Nangle was very familiar with the work of at least one actress in one of the Partnership's movies and knew the reputation of some of the other actors, actresses, and directors. He was reassured repeatedly that because of the movies' caliber, stars and directors, his investment in the Partnership had a high potential for income as well as for tax benefits. Goldenhersh was *313 made aware of the investment opportunity in the Partnership through Bruce Mills, also a broker at Rowland. Goldenhersh was familiar with Rowland and knew it to be a reputable firm. He previously had transacted business through Rowland and Mills although the Partnership was his first contact with respect to a tax shelter investment. Mills sent the offering circular and various tax opinions with respect to the Partnership to Goldenhersh, which he reviewed extensively. Goldenshersh specifically inquired into the quality of the Partnership's movies and was assured that they were not "smutty" films. He determined that the Partnership presented a good opportunity for profit with favorable tax treatment. In August 1975, Canfield and Nangle both invested a total of $20,000 in the Partnership. They each acquired a one-half share of a limited partnership unit interest therein. On August 21, 1975, Canfield delivered to Rowland a cashier's check, dated August 22, 1975, in the amount of $10,000, and a letter of credit and a negotiable promissory note, due on January 15, 1976 and paid in January 1976, in the amount of $10,000. On August 26, 1975, Nangle delivered to Rowland a check of even *314 date, in the amount of $10,000, and a letter of credit and a negotiable promissory note, also due on January 15, 1976, which was paid on January 12, 1976, in the amount of $10,000. Canfield and Nangle each held a 1.5323-percent interest in the Partnership's capital, profits and losses. In September 1975, Goldenhersh invested a total of $40,000 in the Partnership for one full share of a limited partnership unit interest therein. On September 4, 1975, he delivered to Rowland a cashier's check, dated in August 1975, in the amount of $20,000, and a letter of credit and negotiable promissory note due on January 15, 1976 and paid sometime in 1976, also in the amount of $20,000. Goldenhersh held a 3.0645-percent interest in the Partnership's capital, profits and losses. Canfield and Nangle both executed blank Uniform Commercial Code Financing Statements, Forms UCC-1, which listed them as debtors. However, neither financing statement listed any party or property secured thereby as the subject of their debts. Goldenhersh executed a Form UCC-1 that listed him as a debtor to the Partnership, as the secured party, with respect to all of his rights and title to and interest in his limited *315 partnership interest in the Partnership, as the secured property, although the financing statement was not executed on behalf of the Partnership. None of these financing statements were filed in any recording office. The Movies
From 1974 through 1976, Rowland offered approximately ten movie investments to Cohen and Shapiro, to be promoted through the Partnership and their other limited partnership ventures. In 1975, the Partnership acquired the United States and Canadian theatrical and nontheatrical rights to three aforenoted movies entitled "Dragonfly," also known as "One Summer Love," "Deadly Strangers," also known as "Silhouettes," and "The Martyr," each of which were purchased from different sellers. Each seller represented to the general partners the movies' costs of production, the names of the actors and actresses, directors, and other persons associated with the movies, and other information relevant to the Partnership's acquisition of rights to the movies. The Partnership also executed separate distribution agreements for each movie, discussed in greater detail below, with three different distribution companies which were not affiliated with the Partnership or either of its *316 general partners. Each distributor had significant film distribution experience as of 1975. The Partnership's rights to each of the movies purchased were acquired by cash downpayments and the execution of separate nonrecourse promissory notes. Each note expressly provided that neither the Partnership nor any of its partners shall have any personal obligation or liability with respect thereto. The Partnership's obligations to pay the notes were secured only by that collateral stated in their security agreements, that is, the Partnership's rights to and interests in the movies. In the event that the interest and principal amounts of the notes were not satisfied in full as of the notes' maturity, the sellers' sole recourse was to exercise their rights under the security agreements. The offering memo, discussed above, specifically provided that in the event that the income generated by any movie was insufficient to satisfy the Partnership's indebtedness in full, then its seller had the right to reacquire the Partnership's rights to and interests in the movie upon the maturity of the 10-year promissory note. The acquisition and security agreements provided that the principal and interest *317 payments on the notes were to be paid only out of the Partnership's net share of its distribution proceeds, as defined in the distribution agreements discussed below. In each instance, 65 percent of the Partnership's share of the movies' proceeds was to be applied towards the note payments, and was to be allocated first to interest accrued thereon. The Partnership was entitled to retain the remaining 35 percent of its share of the distribution proceeds. 1. "Dragonfly"
The Partnership purchased the rights and title to and interest in "Dragonfly," by an agreement dated August 25, 1975, from American International Pictures, Inc. (AIP), a California film production and distribution company. [11] Although a finders' fee may have been paid for the movie, the record does not establish whether it was paid by the Partnership and the offering memo stated that the finders' fee would be paid by AIP. The movie's total purchase price was $2,525,000, paid in part by a $280,000 cash downpayment and irrevocable letters of credit totaling $210,000 and payable as of January 15, 1976. The balance was evidenced by a 10-year non-negotiable, nonrecourse note, dated August 25, 1975, having a principal *318 amount of $2,035,000 and bearing simple interest at the rate of 7 percent per annum. The Partnership purchased the rights to the movie prior to its completion. AIP represented to the Partnership that the movie was in production as of the time of its purchase. Its budget was approximated at $1,850,000. The movie was filmed in the United States and was completed in late 1975. "Dragonfly" was directed by Gil Cates, whose previous works include "I Never Sang For My Father." The movie stars Beau Bridges and Susan Sarendon, who plays his romantic interest. Bridges plays the role of a young man released from a mental institution where he had been confined for a dangerous mental illness since the age of 13. He believes that his mother is dead and that he killed her. The story centers upon his search to determine whether he is truly guilty. "Dragonfly" received a PG rating from the Classification and Rating Administration of the Motion Picture Association of America, Inc. (the MPAA). Beau Bridges' film credits date from the early 1960's and his credits and reputation *319 were well known as of 1975. He had starred in numerous other films, including "Norma Rae" and "The Other Side of the Mountain." Susan Sarendon's film credits prior to "Dragonfly" include "The Rocky Horror Picture Show" and "The Great Waldo Pepper." 2. "Deadly Strangers"
The Partnership purchased the rights and title to and interest in "Deadly Strangers" from Air Trans Establishment (Air Trans), a Liechtenstein entity, by an agreement dated August 27, 1975. The Partnership did not pay a finders' fee for this movie. The total purchase price was $1,950,000, paid in part by a $200,000 cash downpayment. The balance was evidenced by a 10-year non-negotiable, nonrecourse note dated August 27, 1975, in the principal amount of $1,750,000 and bearing simple interest at the rate of 6 percent per annum. Air Trans represented to the Partnership that the movie's total production costs were approximately $2,686,500. Cohen reviewed the information that he received from the seller but did not retain a certified public accountant to review the records of the movie's production costs. The movie was filmed in Europe and its production costs were incurred outside of the United States. "Deadly Strangers" *320 is a 1974 British thriller. It was directed by Sidney Hayers and stars Hayley Mills, Simon Ward, Sterling Hayden, Ken Hutchison and Peter Jeffrey. Hayley Mills plays the role of a young woman who has offered a ride to a young man, unaware that he is a violent patient who has escaped from a nearby mental institution. Hayley Mills was very popular as a child actress. Her movies include "The Trouble with Angels," "Pollyanna" and "The Parent Trap." At the age of 16 she was said to be the subject of more fan mail than any other motion picture star in the world. Simon Ward's prior roles include "Young Winston," "Hitler -- The Last Ten Days," "The Three Muskateers," and "The Four Muskateers." Sterling Hayden's film credits include "Manhandled," "The Killing," and "Crime of Passion." During the late 1950's and early 1960's, he gained exposure through his work in television. He returned to motion pictures in the 1960's and appeared in "Doctor Strangelove," "The Godfather, " and "The Long Goodbye." "Deadly Strangers" premiered in London, England on March 30, 1975 and was exhibited throughout the United Kingdom before the Partnership purchased its rights to the movie. As of August 1975, *321 the movie had generated $3 million in revenue through its distribution and advance sales. The movie was not rated by the MPAA, whose records revealed that no rating application was filed. The majority of the commercial theaters in the United States would not exhibit the movie because it was not rated by the MPAA. 3. "The Martyr"
The Partnership purchased the rights and title to and interest in "The Martyr" from Blue Water Films, Ltd. (Blue Water Films), a Bahamian corporation, by an agreement dated August 27, 1975. No finders' fee was paid for this movie. The total purchase price of the movie was $1,700,000, paid in part by a $185,000 cash downpayment. The balance was evidenced by a 10-year non-negotiable, nonrecourse promissory note, dated August 27, 1975, in the principal amount of $1,515,000 and bearing simple interest at the rate of 6 percent per annum. Blue Water Films represented to the Partnership that the movie's production costs were approximately $1,900,000. The Partnership did not audit the producer's books or records to verify the accuracy of the seller's representation. The production costs were incurred outside of the United States. "The Martyr" is an Israeli-German *322 co-production, directed by Aleksander Ford, a veteran Polish director. It is based upon the true-life story of Dr. Janusz Korczak, a Jewish Polish doctor who cared for approximately 200 orphans in the Warsaw ghetto during 1942, all of whom died in the Nazi concentration camp in Treblinka. The movie was filmed in color but also used black and white still photographs of the Warsaw ghetto from this time period. The role of Dr. Korczak is played by Leo Genn, a British actor, who died in 1978. Genn's other acting credits include several performances on the Broadway stage and an Oscar nomination for his performance in "Quo Vadis." His other film credits include "Henry V," "Moby Dick," "I Accuse," and "Ten Little Indians." "The Martyr" also was not rated by the MPAA, whose records revealed that no rating application was filed. The majority of commercial theaters in the United States would not exhibit the movie because it was not rated by the MPAA. Distribution Fees and Promissory Note Payments
1. "Dragonfly"
The Partnership executed a distribution agreement, on August 25, 1975, with AIP, the seller of "Dragonfly." AIP was a "minimajor" distributor with a national sales force, which *323 was not as large as a "major" distribution company such as United Artists or Paramount Pictures. The Partnership granted to AIP "the exclusive right, license and privilege to distribute, exhibit, exploit and advertise" the movie in perpetuity in theatrical and nontheatrical markets, including television, in the United States and Canada. AIP agreed to release the movie in the United States on or before December 31, 1975, but did not agree to use its "best efforts" to distribute the movie. [12] Rather, the agreement provided that the distributor had the complete authority to distribute the movie and license its exhibition in accordance with the sales methods, policies and terms as it may determine in its sole discretion. The distributor made no representations, warranties, guarantees or agreement as to the amount of gross receipts or net profits to be derived from the movie, and provided that, in no event shall it incur any liability to the Partnership based upon any claim that the distributor failed to realize receipts or revenue which should or could have been realized. However, the distributor warranted and represented that it would expend no less than $300,000 with respect to advertising, *324 publicity, prints and other distribution expenses in connection with the distribution and exhibition of the movie. The distribution agreement provided that the distributor was entitled to retain as distribution fees a portion of the total adjusted gross receipts (AGR), as defined therein, [13] *325 as follows: (a) 100 percent of the first $900,000 AGR, (b) 75 percent of the next $3,150,000 AGR, (c) 70 percent of the next $3,150,000 AGR, (d) 65 percent of the next $3,150,000 AGR, (e) 60 percent of the next $2,700,000 AGR, (f) 55 percent of the next $2,700,000 AGR, and (g) 50 percent of all AGR in excess of $15,750,000. The balance of all such amounts not retained by the distributor, referred to as the "Producer's Share of Gross Receipts" (the PGR), constituted the Partnership's share of the movie's revenue. However, the distributor had the right to retain all of the PGR until it was reimbursed for the full amount of sums expended for "television residual payments," as defined therein. The distribution agreement further provided that the distributor also had the right to retain 65 percent of the net PGR, that is, the PGR less certain stated deductions, to be applied towards the repayment of the Partnership's promissory note executed in its acquisition of the movie. The Partnership was entitled to receive only the remaining 35 percent of the net PGR until the note was satisfied fully. On June 6, 1977, an agreement was executed between American International Television, Inc. (AIT), [14] as the licensor, and American Broadcasting Company (ABC) for the exclusive network television broadcast of the movie, under the name "One Summer Love." ABC agreed to pay to AIT a license fee, in the amount of $800,000 for the exclusive right to air two broadcasts of the movie during the 3-year period from May 1, 1978 through April 30, 1981. AIT retained the exclusive right to exhibit and exploit the movie on cable or pay television stations during certain time periods stated therein. The record *326 does not disclose whether the Partnership received any portion of the license fee paid by ABC. 2. "Deadly Strangers"
The Partnership executed a distribution agreement, on September 29, 1975, with ScotiaAmerican Productions (Scotia). Scotia was a division of Magenta Films, Inc., a New York corporation, and the entity which first brought the movie to the Partnership's attention. Shapiro believed that Scotia had a good subdistribution network. The Partnership granted to Scotia the exclusive license to distribute the movie in the United States and Canada for a 10-year period "by any and all means and media." The distributor agreed to exhibit the movie theatrically, prior to December 31, 1975, in at least one city in the United States containing a population exceeding 1 million persons, and "to use its best efforts and ability to diligently and in good faith exploit and advertise" the movie and to obtain as wide a distribution as "reasonably possible." It also agreed to provide no less than 500 "play dates," that is, continuous engagements in the same theater for a given number of *327 days, weeks, or years, within the first 2 years of the term of the distribution agreement, and to expend no less than $150,000 to exploit, advertise, promote and manufacture prints of the movie. The Partnership had the right to terminate the distribution agreement without any liability to either party if the distributor failed to obtain aggregate gross receipts, as defined therein and which excluded cooperative advertising expenses, of at least $500,000 within 3 years from the execution of the agreement. The distribution agreement further provided that the distributor was entitled to retain as distribution fees a portion of the movie's total gross receipts, as follows: (a) of the aggregate theatrical and nontheatrical gross receipts: (1) 70 percent of the first $250,000, (2) 65 percent of the next $250,000, (3) 60 percent of the next $250,000, and (4) 50 percent of such receipts in excess of $750,000; and (b) of the television gross receipts: (1) 35 percent of the amounts received with respect to syndicated broadcasting, and (2) 15 percent of the amounts received with respect to network broadcasting. The balance of all such amounts not retained by the distributor was to be distributed *328 to the Partnership. The acquisition agreement executed between the Partnership and Air Trans, the seller of the rights to "Deadly Strangers," required the Partnership to remit to the seller 65 percent of the Partnership's net distribution proceeds, as defined therein, to be applied towards the repayment of the Partnership's promissory note. The Partnership was entitled to retain only the remaining 35 percent of the net distribution proceeds until the note was satisfied. 3. "The Martyr"
The Partnership executed a 13-year distribution agreement, on September 30, 1975, with Joseph Green Pictures Co. (JGP) for the "exclusive and non-transferable license to distribute" the movie for a 13-year period "by any and all means and media" in the United States and Canada. Joseph Green (Green) was a motion picture distributor and producer. He had worked in the film distribution business since 1969 and used 13 subdistributors within the United States and Canada. JGP agreed to "use its best efforts and ability to diligently and in good faith exploit and advertise" the movie and to obtain as wide a distribution thereof as reasonably possible. The distributor also agreed to release and exhibit *329 the movie prior to December 31, 1975 in at least one first-run theater in 2 cities containing populations exceeding 1 million persons each, and to release and exhibit the movie in a minimum of 25 theaters; the Partnership had the right to terminate the agreement without liability to itself if the distributor failed to do so. The distributor further agreed to expend no less than $50,000 to exploit, advertise, promote and manufacture prints of the movie within the first year of the term of the agreement. The Partnership also had the right to terminate the distribution agreement without liability to itself if JGP failed to obtain aggregate gross receipts, as defined therein, of at least $500,000 within 3 years from the date of execution of the agreement. The distribution agreement further provided that the distributor was entitled to retain as distribution fees a portion of the total gross receipts, as follows: (a) of the aggregate theatrical and non-theatrical gross receipts: (1) 70 percent of the first $200,000, (2) 60 percent of the next $200,000, (3) 50 percent of the next $600,000, (4) 40 percent of the next $2,000,000, and (5) 35 percent of such receipts in excess of $3,000,000; *330 and (b) of the television gross receipts: (1) 30 percent of the amounts received with respect to syndicated broadcasting, and (2) 15 percent of the amounts received with respect to network broadcasting. The distribution agreement was amended, on May 30, 1978, with respect to the Partnership's share of revenue realized from television, cable, "Payvee" and home video exploitation. As amended, all revenue attributable to "substandard (16 mm, tape cassettes or tapes) materials" were to be recouped by the distributor directly from gross revenue, and the remaining revenue was to be paid 50 percent each to the distributor and to the Partnership. The acquisition agreement executed between the Partnership and Blue Water Films, the seller of "The Martyr," also required the Partnership to remit to the seller 65 percent of the Partnership's net proceeds derived from the movie's exploitation, to be applied towards the repayment of the Partnership's promissory note. The Partnership was entitled to retain only the remaining 35 percent of the net distribution proceeds until the note was satisfied. Each of the three distributors also agreed to maintain complete and accurate books of account and records *331 of their distribution activities with respect to the movies and granted to the Partnership and its representatives the right to inspect such books and records. The Partnership never audited any of the distributors' records. Revenue Realized
Despite some name recognition of the movies' casts, directors and producers, the movies received only mediocre reviews in movie journals and newspapers and very disappointing financial returns. 1. "Dragonfly"
As of December 1984, "Dragonfly" generated total domestic and foreign theatrical and nontheatrical revenue in the amount of $1,245,827.21. In accordance with the terms of the distribution agreement, AIP, as the distributor, retained as distribution fees a total of $1,159,370.41, that is, 100 percent of the first $900,000 plus 75 percent of the remaining $345,827.21 of the adjusted gross receipts realized, or $259,370.41. Therefore, the Partnership's share of the total revenue realized from 1975 through 1984 was only $86,456.80. AIP also had the right to retain, in its capacity as the seller, 65 percent of the Partnership's net proceeds, as payments on the promissory note executed in the Partnership's purchase of its rights to the movie. *332 As of December 1984, the Partnership had paid $56,196.92 (65% X $86,456.80) on the note, whose total liability then equaled $3,364,533.33 ($2,035,000 principal plus 9 years' and 4 months' interest at 7 percent per annum). The Partnership was entitled to retain a total of only $30,259.88 from the total revenue realized from "Dragonfly" from the time of its purchase in 1975 through December 1984. However, as of June 1982, the Partnership had not received any amounts from AIP from the movie's distribution. 2. "Deadly Strangers"
As of 1980, Scotia had gone out of business and the record does not indicate the name of any subsequent distributor of "Deadly Strangers." The record does not contain any information with respect to the amount of revenue generated by the movie for any year other than 1976. In 1976, "Deadly Strangers" generated net film rental revenue, that is, gross receipts less cooperative advertising expenses, in the amount of $415. In accordance with the terms of the distribution agreement, Scotia retained as distribution fees 70 percent of such receipts, or $290.50. Therefore, the Partnership's share of the total revenue generated was only $124.50. The Partnership was *333 required to remit to Air Trans, the movie's seller, 65 percent of its net distribution proceeds as payments on the promissory note executed in the purchase of its rights to the movie. As of August 1985, the Partnership had paid a total of $80.93 (65% X $124.50) on the note, the total liability of which then equaled $2,800,000 ($1,750,000 principal plus 10 years' interest at 6 percent per annum). The Partnership retained a total of only $43.58 from the total revenue realized from "Deadly Strangers" from the time of its purchase in 1975 until 1985. 3. "The Martyr"
"The Martyr" generated total revenue in the amount of $3,105.83 as of August 26, 1985. [15] *334 In accordance with the terms of the distribution agreement, the distributor, JGP, retained as distribution fees 70 percent of this amount, or $2,174,09. Therefore, the Partnership's share of the total revenue realized from 1975 through August 26, 1985 was only $931.74. [16] The Partnership also was required to remit to Blue Water Films, the seller, 65 percent of the Partnership's net proceeds as payments on its promissory note executed in the purchase of its rights to the movie. As of August 1985, the Partnership had paid $605.63 (65% *335 X $931.74) on the note, whose total liability then equaled $2,424,000 ($1,515,000 principal plus 10 years' interest at 6 percent per annum). The Partnership retained a total of only $326.10 from the total revenue realized from "The Martyr" from the time of its purchase in 1975 until 1985. Partnership Financial Records
Balance sheets and statements of operations and other work papers were prepared from the Partnership's books and records for each of the taxable years in issue. However, inasmuch as the certified public accountants who prepared the Partnership's books and records, W.R. Woolf & Co. for 1975, M.F. Rosenbaum & Co., P.C. for 1976, and Harvey Ehrlich (Ehrlich) for 1977 through 1981, did not independently verify the information provided therein, they were unable to express an opinion with respect to the representations made on the financial statements they prepared. Returns Filed by the Partnershipand Petitioners
The Partnership filed Federal income tax returns, Forms 1065, for the taxable years ended December 31, 1975 through December 31, 1981. The Partnership's 1977 through 1981 returns were prepared by Ehrlich or members of his firm. [17] *336 The Partnership elected on its 1975 return to claim depreciation deductions based upon the percentage of distribution method of depreciation. The accountants who prepared the Partnership's returns relied upon statements and assertions by the distributors with respect to the movies' so-called "market penetration" in order to calculate the depreciation deductions claimed on the returns. The Partnership reported the following amounts of income, based upon gross receipts and rental income, and deductions, based upon interest expenses accrued on the nonrecourse notes, depreciation of the movie properties, amortization of organizational expenses, management fees, distribution costs and other miscellaneous expenses: 1975
1976
1977
1978
Gross Receipts
$ 31,628 $ 768 Rental Income
[18]
Total Income
31,628 768 Accrued Interest
348,709 338,350 $338,350 Depreciation
$2,231,250 2,356,250 352,500 494,000 Organization Exps.
59,450 59,450 59,450 59,450 Management Fees
40,000 35,600 Distribution Costs
2,184 31,503 Other Expenses
1,396 2,682 2,250 500 Total Deductions
$2,332,096 2,804,875 784,053 892,300 Net Losses
($2,332,096)
($2,773,247)
($783,285)
($892,300)
1979
1980
1981
Totals
Gross Receipts
$ 43 $ 32,439 Rental Income
Total Income
43 32,439 Accrued Interest
338,350 $338,350 $338,350 2,040,459 Depreciation
5,434,000 Organization Exps.
29,450 267,250 Management Fees
75,600 Distribution Costs
33,687 Other Expenses
500 500 500 8,328 Total Deductions
368,300 338,850 338,850 7,859,324 Net Losses
($368,257)
($338,850)
($338,850)
($7,826,885)
*337 The Partnership also claimed an investment credit with respect to its rights in the movie properties. On its 1975 return, it reported an interest in new investment property having a useful life of "5 or more but less than 7 years" and a value and basis in the amount of $6,175,000. Petitioners reported the following amounts on their Federal income tax returns filed for the taxable years ended December 31, 1975 through December 31, 1981, with respect to their respective distributive shares of partnership losses and investment credits: Year
Petitioner
Ended
Losses
Canfield
1975
$35,742
1976
42,492
1977
12,002
Nangle
1975
35,742
1976
42,492
1977
12,002
1978
13,673
1979
5,643
1980
5,192
1981
5,192
Goldenhersh
1975
71,484
On their 1975 returns, Canfield and Nangle each also reported interests in new investment property having a basis of $94,616, and they each claimed investment credits in the amount of $6,307. On his 1975 return, Goldenhersh reported an interest in new investment property having a basis of $189,233 and claimed an investment *338 credit in the amount of $12,615. Deficiencies Determined
In the statutory notices of deficiency issued to each petitioner in these consolidated cases, respondent disallowed in full petitioners' respective distributive shares of partnership losses, deductions and investment credits allocated to them with respect to their interests in the Partnership. In his amended answers, and in his answer in docket No. 5328-85 only, respondent also alleged that a portion of each of the underpayments determined was attributable to a tax motivated transaction. OPINION The first issue for decision is whether respondent properly has disallowed in full petitioners' deductions of their respective distributive shares of partnership losses, including interest accrued on the nonrecourse notes and deductions attributable to depreciation expenses, and investment credits, based upon the determination made in the statutory notices of deficiency that the activities of the Partnership were not engaged in for profit. [19] The second issue presented is whether petitioners are liable for additional interest in accordance with section 6621(c), based upon respondent's allegations, by answers and amended answers, that *339 a portion of each of the underpayments determined constitutes a substantial underpayment attributable to a tax motivated transaction. Profit Objective
Respondent's primary argument is that the Partnership was neither organized nor managed with the intention of making a profit. Petitioners argue that the record establishes the clear intention of the general and limited partners to make a profit. Petitioners bear the burden of proving that the Partnership's activities were engaged in for profit. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). *340 The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471, 501-505 (1982); Siegel v. Commissioner,78 T.C. 659, 698 (1982). The expectation of making a profit need not be reasonable so long as there is a bona fide objective to realize a profit. Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). It must be determined whether there was an "actual and honest profit objective." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The parties have framed this issue in terms of whether the Partnership's activities were "not engaged in for profit" within the meaning of section 183, [20] *342 which imposes a subjective test. The regulations promulgated under section 183 provide that greater weight is to be given to objective factors and list a series of nonexclusive factors that are normally to be considered to determine one's subjective intent. Sec. 1.183-2(a) and (b), Income Tax Regs.; [21]Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). However, we also have applied an objective *341 test pursuant to which transactions have been disregarded for Federal income tax purposes where they are found to be devoid of economic substance consonant with their intended tax effects. See generally Rose v. Commissioner,88 T.C. 386, 408-415 (1987). [22] As stated therein, it is preferable to analyze certain transactions, engaged in by so-called "generic tax shelters" as here, see Rose v. Commissioner,supra at 412-413, under a unified approach emphasizing objective factors, such that -- the objective and subjective tests merge into an approach in which the objective test incorporates factors considered relevant in cases decided under *343 section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case. [Rose v. Commissioner,supra at 414-415.] Based upon the analysis below of the objective factors in the instant case, specifically, the dealings between the Partnership, petitioners and the movies' sellers, the relationship between the movies' purchase prices and their fair market values, the movies' inflated purchase prices due to the nonrecourse financing, and the perceived congressional intent, we find for respondent that the activities of the Partnership lack economic substance. [23]
1. Dealings between the Partnership, Petitioners and the Sellers
Petitioners argue that the favorable tax treatment of their interests in the Partnership merely provided an additional incentive but that their highly speculative investments were "guided by" a profit motive. *344 Canfield and Nangle each purchased one-half shares of a limited partnership unit interest for $20,000 each, and Goldenhersch purchased one full share of a limited partnership unit interest for $40,000. Based upon the entire record, we conclude that petitioners invested in the Partnership primarily in anticipation of tax benefits to offset their substantial income from other sources, and that the general partners sought to realize immediate financial gains by organizing the venture. See Rose v. Commissioner,88 T.C. at 415. The purchase of the limited partnership interests were promoted to prospective investors through a Confidential Descriptive Memorandum (the offering memo). The offering memo provided that the investments were available only to investors whose net worth was at least $200,000 and that some portion of their annual gross income was subject to Federal income tax at a rate of 50 percent or higher. [24] Petitioners argue that they invested in the Partnership only after their careful review of the offering memo and the various documents included therein. Approximately one-fourth of the offering memo was devoted to discussions of various tax considerations, including legislative *345 proposals to limit deductions to amounts "at risk" in certain investments, the Partnership's intention to use the income forecast method of depreciation, the inclusion of nonrecourse debts in the partners' partnership bases, the availability of investment credits, and the possible application of section 183 to disallow deductions claimed by the partners. The offering memo provided that the general partners had prior experience with the acquisition and distribution of motion pictures, principally as organizers and/or general partners of six other movie limited partnerships. However, the general partners' experiences with respect to movie investments commenced in 1974, less than 1 year prior to the formation of the Partnership. At trial, Cohen testified that he was attracted to the motion picture industry because it sounded very exciting and glamorous, although, as he said, he did not "know the first thing about it -- other than * * * how to buy popcorn in the motion picture theater and [he] was an avid movie-goer * * *." [25] From 1974 through 1976, Cohen and Shapiro formed a total of 16 movie limited partnerships through ICA Productions Corp. *346 (ICAP), their wholly owned corporation. None of the movie partnerships generated sufficient revenue to pay off the interest or principal amounts due on their nonrecourse obligations incurred in their acquisitions of their movies. Each partnership paid an organization fee to ICAP in the amount of approximately $200,000. The offering memo provided that a substantial portion of the $265,000 fee paid to ICAP by the Partnership was likely to be paid to other persons as finders' fees. However, the general partners did not pay any finders' fees with respect to any of the movies whose rights were purchased on behalf of the Partnership. Furthermore, the general partners received management fees from the Partnership in 1975 in the amount of $20,000 each, and also were entitled to receive annual compensation in an amount equal to 1 percent of the Partnership's cash flow. The Partnership purchased the rights and title to and interest in three movies, entitled "Dragonfly," "Deadly Strangers," and "The Martyr." The aggregate sales price of the movies was $6,175,000, of which $875,000 was paid either upon closing or secured by letters of credit paid within *347 5 months of closing. The $5,300,000 balance was evidenced by 10-year nonrecourse, non-negotiable purchase money notes bearing simple interest at the rate of either 6 or 7 percent per annum. The notes were to be satisfied solely out of the Partnership's share of net receipts realized from the movies' exploitation. The Partnership's obligations to repay the notes were secured only by its interests in the movies. In the event that the movies failed to generate sufficient revenue for the Partnership to satisfy its indebtedness, the sellers had the right to reclaim their movies upon the maturity of the promissory notes. The purchase price of each movie was as follows: Movie
Purchase Price
Downpayment
Nonrecourse Note
Dragonfly
$2,525,000
$490,000
$2,035,000
Deadly Strangers
1,950,000
200,000
1,750,000
The Martyr
1,700,000
185,000
1,515,000
Total
$6,175,000
$875,000
$5,300,000
Petitioners contend that the purchase prices are closely related to the movies' costs of production. The sellers represented to the Partnership their approximate production costs, as follows: Movie
Production Costs
Dragonfly
$1,850,000
Deadly Strangers
2,686,500
The Martyr
1,900,000
Total
$6,436,500
While we agree that established production *348 costs are relevant to a determination of fair market values, these are not the sine qua non of such values. Insofar as the production costs at issue here, we note that the manager of the tax shelter department employed by the brokerage house, which conducted the due diligence investigation and solicited investments in the Partnership, was unable to verify such representations made with respect to either "Deadly Strangers" or "The Martyr." Further, the Partnership did not audit any of the sellers' records to verify the accuracy of the stated production costs. Finally, although the total purchase prices and production costs are closely related, they do not correspond to each of the movies individually. For example, the purchase price of "Deadly Strangers" is approximately $700,000 less than its stated production costs, whereas the purchase price of "Dragonfly" exceeds its stated production costs by approximately this same amount. Similarly, the distribution agreements provided that each of the distributors agreed to expend no less than certain stated amounts to distribute, advertise and exploit the movies. At trial, the distributor of "The Martyr" acknowledged that he did not spend *349 the amount required in his agreement. The Partnership did not verify whether the other movies' distributors satisfied their obligations. [26]
2. Relationship Between Purchase Price and Fair Market Value
Petitioners argue that the movies' aggregate purchase price, $6,175,000, reasonably approximates their fair market values as of 1975. Respondent's one expert has appraised the movies at a number of different values, based upon different analyses. Respondent argues that at the time of their purchases the movies' aggregate fair market values did not exceed $234,000. Petitioners contend that the movies' fair market values as of 1975 equaled the amounts agreed to by the Partnership, as a willing buyer, and the movies' sellers, as willing sellers, dealing in arm's-length transactions. Petitioners argue in a conclusory manner that their movies' purchase prices should be respected as their fair market values because the *350 parties have stipulated that the Partnership and the sellers are unrelated parties. However, petitioners have not presented any evidence to support their bare assertions that the Partnership "vigorously" negotiated the purchase prices at arm's length. Rather, petitioners argue that the purchase prices are supported by the sellers' representations of the movies' production costs, as noted above. Petitioners' expert, Dr. John Rider (Rider), a professor of mass communication at Southern Illinois University at Edwardsville, evaluated the three movies on behalf of petitioners. In a letter to Nangle, dated October 30, 1984, he concluded that as of 1975 the movies' purchase prices certainly were equal to their fair market values. He stated that with adequate promotion and marketing the Partnership could have expected a financial reward in excess of the purchase prices, although he acknowledged that there was no present prospect of recapturing the Partnership's expenses already incurred. In a subsequent letter to Nangle, dated January 14, 1985, Rider stated that, based upon his rather extensive review of their stars, directors and themes, as of 1975, the movies presented "indeed a viable *351 offering of investment opportunity in the motion picture industry" and "a highly legitimate and attractive promise for investment purposes." When asked to express his opinion of the approximate dollar values of each film, he valued each movie at its exact purchase price without any explanation. At trial, Rider stated that "Dragonfly" could easily have generated a maximum theatrical, television and radio revenue in the amount of $25 million, and a minimum revenue of $10 million; that "Deadly Strangers" could have been expected to realize between $8-10 million; and that, given proper distribution, "The Martyr" could have generated gross receipts of $10 million. Rider explained that he assumed the films were worth at least the amounts expended to produce them. He described their production costs as a "shorthand of known facts" of how much it costs to acquire a movie. Petitioners argue that production costs provide a tangible basis upon which the movies' values may be judged and validated and are a significant factor in determining their fair market values. Respondent contends that there is absolutely no correlation between a movie's production costs and either its projected film rentals *352 or its fair market value. Although production costs may be a measure of fair market value, Siegel v. Commissioner,78 T.C. 659, 687-688 (1982), we are not persuaded that petitioners' position is justifiable here. The Partnership's movies' purported production costs were never verified by any independent investigation on the Partnership's behalf, and, more importantly, do not correspond with the movies' purchase prices, as noted above. Rider also testified that in determining the movies' values he took into account the appraisal letters attached to the offering memo. He stated that he relied upon the opinions expressed therein, although he did not have any independent knowledge of their authors' qualifications or expertise aside from the information contained in the offering memo itself. We also question the extent to which he may rely upon these purported appraisals. The letters, mere verbatim reproductions of one another, do not appraise the value of the movies or project their anticipated revenue but simply conclude that the movies are worth their stated purchase prices. Joseph Green (Green) of Joseph Green Productions, the distributor of "The Martyr," also testified on petitioners' *353 behalf. He stated that in 1975 he had estimated that "The Martyr" would generate gross receipts of at least $5-6 million. His projections appear to be so exaggerated that they simply are not credible. Moreover, as of 1975 Green had never distributed a movie that generated gross revenue in excess of even $1 million. We accord little, if any, weight to his testimony and attribute his overly optimistic projections to his obvious bias as a party to a contract with the Partnership. See Rose v. Commissioner,88 T.C. at 418 and cases cited therein. Respondent's only expert, Woodrow W. Sherrill (Sherrill), had worked in the motion picture industry for over 45 years, primarily in the distribution of movies, and was retired as of the date of trial. Sherrill appraised the movies' aggregate theatrical value at $180,000, and their aggregate value in all media first at $234,000 and later revised this value to $127,900. Petitioners argue that Sherrill does not qualify as an expert and that his opinions are based upon arbitrary conclusions and speculation and constitute mere hindsight conclusions that have no merit and therefore are not entitled to any weight. Petitioners describe Sherrill's *354 valuations as "ridiculously low" and not based upon any verifiable or supportable assumptions, conclusions or substantive foundation. However, petitioners challenged Sherrill's qualifications as an expert at trial, and we ruled that although his experience does not qualify him as an expert on all elements of the film business, his testimony is admissible for his expertise in evaluating movies' sales potential. Moreover, unlike petitioners' expert, Sherrill's conclusions are based upon the terms of the movies' acquisition and distribution agreements. To summarize briefly, each of the distribution agreements provided that the distributors were entitled to retain certain percentages of the revenue realized from the movies' exploitation, in accordance with schedules stated therein. Additionally, the principal and interest payments on the Partnership's promissory notes to the sellers were to be satisfied solely out of the Partnership's share of the revenue realized from the movies; 65 percent of the net receipts payable to the Partnership were to be applied toward its repayment of the notes. Sherrill has appraised the movies' theatrical values based upon their projected film rentals, *355 less distribution fees and expenses (in the amount of 60 percent for "Dragonfly" and "Deadly Strangers" as typical films and 70 percent for "The Martyr" as an "art" film), less 50 percent attributable to profit and risk. He increases the theatrical values by 30 percent to derive the movies' values in all media. Sherrill concludes that, based upon its distribution fees and note payments, a profit on the movie "Dragonfly" is "virtually impossible," and values the Partnership's rights to this movie at zero. Sherrill appraises the theatrical values and the values in all media of the Partnership's rights to the two other movies, which he later revised to take into account the Partnership's obligations on the promissory notes, as follows: Gross
Theatrical
All
Revised
Movie
Revenue
Value
Media
Value
Deadly Strangers
$ 225,000
$ 45,000
$ 58,500
$ 18,900
The Martyr
[27] *356 900,000
135,000
175,500
109,000
Total
$1,125,000
$180,000
$234,000
[28] *357 $127,900 Sherrill also has valued the movies based upon what he refers to as the circumstances surrounding their purchases, including their anticipated depreciation deductions and the Partnership's repayment of its promissory notes. He concludes that the anticipated tax benefits were the single gain sought by the Partnership, and assigns a zero value to the three movies. As indicated above, we reject petitioners' expert's conclusion that the movies' fair market values equaled their purchase prices, although we find it unnecessary to determine their exact values as of the time of their purchases by the Partnership. We need only conclude that their aggregate fair market value did not exceed $875,000, the total amount of the cash paid upon the Partnership's acquisition of the films. Clearly, the movies' fair market values did not reasonably *358 approximate their $6,175,000 aggregate purchase price. 3. Nonrecourse Financing
The presence of a deferred debt that is not likely to be paid is an indicia of lack of economic substance. Rose v. Commissioner,88 T.C. at 419-420 and cases cited therein. The existence of a highly inflated purchase price based upon a nonrecourse note may contribute to the finding that an activity was not entered into for profit. Flowers v. Commissioner,80 T.C. 914, 937 (1983). In the instant case, the nonrecourse notes constitute the following percentages of the movies' total purchase prices: "Dragonfly" -- 80.6 percent ($2,035,000/$2,525,000); "Deadly Strangers" -- 89.7 percent ($1,750,000/$1,950,000); "The Martyr" -- 89.1 percent ($1,515,000/$1,700,000). Petitioners contend that there is nothing in the Partnership's structure to suggest that the notes could not or would not be fully satisfied. They argue that the Partnership had an economic incentive to repay the notes because the terms of the acquisition and distribution agreements allowed the Partnership to participate in the movies' profits immediately after the distributors recouped their expenses. Petitioners also argue that the movies' *359 anticipated theatrical receipts were sufficient to satisfy the notes as well as generate a significant profit to the Partnership. We agree with respondent that the promissory notes do not represent genuine indebtedness. From our foregoing discussion, it is plain that we do not believe that the movies' fair market values as of 1975 reasonably approximated even the amounts of the promissory notes. [29]
Interest and principal payments on the promissory notes were payable only from the Partnership's share of the movies' net receipts, as stated above. The offering memo provided that in order for the Partnership to satisfy only the principal payments on the notes, the movies would have to generate "distributor's gross receipts," as defined therein and acknowledged as potentially substantially less than total gross box office receipts, in approximately the following amounts: "Dragonfly" -- $11,000,000; "Deadly Strangers" *360 -- $5,600,000; and "The Martyr" -- $4,150,000. Petitioners also have stated that, in order for the Partnership to satisfy the notes, the movies would have to generate gross receipts in approximately the following amounts: "Dragonfly" -- $12,500,000-$13,200,000; "Deadly Strangers" -- $7,750,000; and "The Martyr" -- $5,500,000. Petitioners have not presented any credible evidence to indicate that as of 1975 it was reasonable to anticipate that the movies would generate revenue in these amounts. Neither "Deadly Strangers" nor "The Martyr" received any rating from the Classification and Rating Administration of the Motion Picture Association of America, Inc. (the MPAA), whose records reveal that no such rating applications were even filed. At trial, petitioners' expert acknowledged that a majority of commercial theaters in the United States would not exhibit movies that were not rated by the MPAA. Not surprisingly, the Partnership reported net losses in each year in issue. It reported total gross receipts in the amount of only $32,439, [30] and total deductions in the amount of $7,859,324, for the 1975 through 1981 taxable years. [31] The record establishes that actual gross revenue realized *361 from "Dragonfly" from 1975 through 1984, "Deadly Strangers" for 1976 only, and "The Martyr" from 1975 through 1985, the Partnership's share of such revenue, its payments on the notes and the amounts it was entitled to retain, were as follows: Gross
Partnership's
Note
Amount Retained
Movie
Revenue
Share
Payments
by the P'ship
Dragonfly
$1,245,827.21
$86,456.80
$56,196.92
$30,259.88
Deadly Strangers
415.00
124.50
80.93
43.58
The Martyr
3,105.83
931.74
605.63
326.10
Inasmuch as the sole collateral securing each note consists of only the Partnership's rights to and interests in each movie, and given that in just the first year of the Partnership the tax benefits to each petitioner exceeded their respective partnership contributions, the threat of the sellers' foreclosure on the notes provided little economic incentive for the Partnership to repay the obligations. 4. *362 Perceived Congressional Intent
The fourth factor analyzed in Rose v. Commissioner,88 T.C. at 421-422, is the perceived congressional intent. Just as in Rose, we are not at all persuaded that Congress intended to encourage activities such as the movie investments in issue here. There is no evidence or reason to believe that the activities engaged in by the Partnership and petitioners in these consolidated cases are among those favored by Congress. Accrued Interest on the Nonrecourse Notes
Implicit in our conclusion that the notes do not constitute genuine indebtedness is that petitioners are not entitled to deduct any interest purportedly accrued thereon. Fox v. Commissioner,80 T.C. 972, 1019 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), *363 affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984); Flowers v. Commissioner,supra at 942-943. Disallowed Depreciation Deductions and Investment Credits
Respondent also has disallowed petitioners' claimed depreciation deductions, based upon the determinations that petitioners improperly included the amount of the nonrecourse notes in their partnership bases, and calculated the amounts of the deductions based upon an impermissible method of depreciation. [32] Respondent has further determined that petitioners are not entitled to an investment credit with respect to any of the Partnership's movie properties. [33]
Section 167(a) *364 allows a deduction for depreciation only with respect to property either used in a trade of business or held for the production of income, and section 48(a)(1) provides that only property with respect to which depreciation is allowable qualifies for the investment credit. Petitioners' entitlement to their claimed depreciation deductions and investment credits also depends upon the showing, at a minimum, that the activities of the Partnership were entered into with an actual and honest profit objective. Taube v. Commissioner,88 T.C. 464, 478 (1987). As stated above, the activities of the Partnership were not engaged in for profit. Therefore, any basis that the Partnership held in the movie properties must be disregarded for purposes of calculating depreciation or investment credits. We need not engage in separate analyses to sustain respondent's disallowances of petitioners' depreciation deductions and investment credits. See also Rose v. Commissioner,88 T.C. at 421-422. We conclude that the activities of the Partnership are devoid of economic substance consonant with their intended tax effects. Accordingly, we hold that respondent properly has disallowed the losses, deductions *365 and credits claimed by petitioners with respect to their interests in the Partnership for each of the years in issue. Additional Interest under Section 6621(c)
The second issue for decision is whether respondent has properly determined that petitioners are liable for additional interest under section 6621(c). [34] Respondent alleges that the claimed value of the Partnership's rights in the movies constitutes a valuation overstatement within the meaning of section 6659(c). He further alleges that by virtue of the valuation overstatement, petitioners' distributive shares of depreciation deductions, ordinary losses and credits constitute tax motivated transactions within the meaning of section 6621(c)(3)(A)(i). Inasmuch as he has raised this issue in his answers and amended answers, respondent bears the burden of proof. Section 6214(a); Rule 142(a); Zirker v. Commissioner,87 T.C. 970, 981 (1986). Section 6621(c)[35] *367 provides for an increased rate of interest with respect to any "substantial underpayment attributable to tax motivated transactions," defined as any underpayment in excess of $1,000 attributable to one or more tax motivated transactions. Sec. 6621(c)(1) *366 and (2). The term "tax motivated transaction" includes "any valuation overstatement (within the meaning of section 6659(c))," sec. 6621(c)(3)(A)(i), that is, where the value or adjusted basis of property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such value or adjusted basis. [36]
Petitioners argue that the Federal income tax laws have changed significantly since the formation of the Partnership, and the additional rate of interest under section 6621(c) should not affect the tax consequences of their interests in the Partnership. We reject petitioners' contention that respondent improperly seeks to extend the application of section 6621(c) here. The increased rate of interest applies to interest accruing after December 31, 1984 even where the *368 transactions were entered into prior to the date of enactment of this subsection. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent argues that the reported value of the Partnership's rights to the movies constitutes a valuation overstatement such that a portion of each of the underpayments determined is attributable to a tax motivated transaction. He concludes that the increased rate of interest is applicable for all interest accruing after December 31, 1984 for each petitioner in his respective taxable years in issue, and that, except for the settlement of one adjustment (see n.6, supra), every adjustment in these cases is subject to the additional rate of interest. Petitioners argue that the Partnership properly has claimed that the fair market value of the Partnership's interest in the movies is $6,175,000, the amount of the movies' aggregate stated purchase price including the nonrecourse notes, such that no addition is appropriate for an underpayment due to a tax motivated transaction. As stated above, we have determined that the value of the Partnership's interest in the movies does not exceed $875,000. *369 Therefore, the amount claimed on the Partnership's return is at least 706 percent of the correct amount of the Partnership's interest. The valuation overstatement greatly exceeds the 150 percent threshhold amount provided in section 6659(c) and clearly generates "substantial" underpayments, that is, in excess of $1,000. Accordingly, respondent has satisfied his burden of proof that the additional rate of interest applies to the underpayments attributable to the valuation overstatement of the Partnership's movies, which includes the full amount of the underpayments attributable to petitioners' respective distributive shares of the Partnership's losses, deductions and credits. [37]
Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: James F. Nangle, Jr. and Carole Nangle, docket Nos. 16603-83 and 5328-85, and Samuel J. Goldenhersh and Frieda Goldenhersh, docket No. 16604-83.↩
2. Consents and Special Consents to Extend the Time to Assess Tax, Forms 872 and 872-A, were executed in each of these consolidated cases for all of the taxable years in issue. No issue has been presented with respect to the timeliness of any of the statutory notices of deficiency. ↩
3. As of the date of trial, certain subsequent taxable years of petitioners in docket Nos. 16602-83 and 16604-83 also were in various stages of respondent's administrative review with respect to their interests in the partnership in issue here. Such years were not placed in issue with the cases consolidated herein. 4. Petitioner Weldon L. Canfield died on or about November 16, 1984. By order of the Chief Judge, dated May 1, 1985, petitioners' Motion to Substitute Party and to Change Caption was granted and the Estate of Weldon L. Canfield, Deceased, Centerre Trust Company and Jean W. Canfield, Co-Executors and Jean W. Canfield were substituted as petitioners in docket No. 16602-83.↩
5. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Respondent cites to sec. 6621(d), which was redesignated sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986. Pub. L. 99-514, 100 Stat. 2085, 2744 (1986). All such references made herein cite to the Internal Revenue Code as redesignated.
6. Petitioners in docket No. 16603-83 and respondent each concede to one-half of the only additional adjustment made by respondent, a determination of unreported income, in the amount of $460, for the 1976 taxable year. ↩
7. Petitioners concede to respondent's disallowance of the investment credits claimed with respect to two of the three movies involved herein.↩
8. We note that the parties have stipulated that only petitioner Jean W. Canfield is a party to these cases solely by virtue of having filed a joint Federal income tax return with petitioner Weldon L. Canfield and that she had no knowledge of the transactions in issue.↩
9. Cohen and Shapiro terminated their business relationship as of August 1976. As of the date of trial, Cohen was involved in civil litigation against some of the Partnership's limited partners.↩
10. Apparently, the initials "ICA" represent Irving Cohen and Associates.↩
11. In 1979, AIP was purchased by Filmways, which was later reorganized, and as of the date of trial, was known as Orion Pictures.↩
12. The offering memo, discussed above, also provided that the distribution agreement for "Dragonfly" would not impose a continual obligation upon the distributor to use its best efforts to exploit the movie.↩
13. Total revenue was divided into the following categories: domestic, Canadian and foreign theatrical revenue; domestic, Canadian and foreign television revenue; and nontheatrical and miscellaneous revenue.
14. The record does not indicate the relationship between AIT and the Partnership or any of its partners.↩
15. This finding is based upon petitioners' failure to object to respondent's requested findings of fact. However, we note that this amount is not readily apparent from the documents received in evidence, some of which are barely legible. Moreover, the requested findings characterize this amount as "net film rental revenue" although the distribution agreement provided that JGP was entitled to retain specified percentages of "total gross receipts." We also note that Cohen informed Nangle, in a letter dated December 5, 1975, that the opening night performance of "The Martyr" was completely sold out. The record does not indicate the amount of revenue realized from this performance, although the letter stated that the entire proceeds generated by this benefit performance would be donated to charity in accordance with an agreement with the distributor. ↩
16. This amount appears to be derived from the Partnership's following shares of revenue realized: $768.33 in 1976-1977, $14.91 in 1978, and $148.50 in 1979-1981. We note that it does not include any amounts for the Partnership's share, if any, of the $36.10 gross receipts realized in 1975, or any revenue that may have been realized after 1981.↩
17. Although the parties stipulated that only the Partnership's 1977 through 1981 returns were prepared by Ehrlich or members of his firm, the Partnership's 1975 and 1976 returns included Powers of Attorney, Forms 2848, which listed Ehrlich as the Partnership's attorney-in-fact for said returns.
18. The Partnership's 1975 return erroneously listed rental income in the amount of ($2,231,250), all of which was attributable to depreciation, and listed depreciation deductions as zero.↩
19. In the notices of deficiency, respondent determined alternatively that the fair market values of the movies has not been established and that the nonrecourse notes lack economic substance, such that petitioners' proportionate shares of such notes are not includable in their respective partnership bases. Respondent further determined that, for the 1976 and 1977 taxable years only, if the disallowed partnership deductions are allowable in whole or in part, then petitioners are subject to the "at risk" provisions of section 465. Based upon our disposition of respondent's primary argument we need not address his alternative positions.↩
20. Section 183(a) provides the general rule that, in the case of an activity not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(b)(1) provides that there shall be allowed those deductions that would be allowable without regard to whether the activity is engaged in for profit, and section 183(b)(2) provides that deductions that would be allowable if the activity were engaged in for profit shall be allowed only to the extent that the gross income derived from the activity exceeds the deductions allowable under section 183(b)(1). Section 183(c) defines the term "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." 21. Section 1.183-2(b), Income Tax Regs.↩, lists the following factors to be considered, in addition to all of the facts and circumstances surrounding the activity, in this determination: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his or her advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits earned, if any; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation involved in the activity.
22. See also Tassistro v. Commissioner,T.C. Memo. 1987-192, and Gilbert v. Commissioner,T.C. Memo. 1987-165↩.
23. We note that the same result would have been reached based upon the subjective intent analysis of sec. 183, focusing upon petitioners' lack of profit objective. References to the relevant factors listed in the regulations promulgated under sec. 183↩ are noted.
24. See sec. 1.183-2(b)(8), Income Tax Regs.↩
25. See sec. 1.183-2(b)(2), Income Tax Regs.↩
26. The Partnership's mere acceptance of the information furnished by the sellers, and failure to verify the records of the sellers and the distributors, also indicates that its activities were conducted in an unbusinesslike manner. See sec. 1.183-2(b)(1), Income Tax Regs.↩
27. The expert's report notes that the estimated $900,000 theatrical revenue is based upon certain pre-selling plans to distribute "The Martyr," but that he did not know whether such plans were executed. Alternatively, absent such plans, he estimated the projected revenue at only $450,000, which would lead to a theatrical value of $67,500, that is, $450,000 less 70% for distribution fees and 50% for profit and risk, and a value in all media of $87,750, that is, $67,500 X 1.3%. 28. We agree that the value of the Partnership's rights to "Dragonfly" are negligible, based upon the distributor's right to retain 100 percent of the first $900,000 of gross receipts and from 50 to 75 percent of the additional receipts and because the annual accrued interest payments alone on the promissory note equal $142,450 ($2,035,000 X 7%). We would, however, compute somewhat greater values for the two other movies based upon respondent's projections of their gross revenue and his assumption that a movie's value in all media is 30 percent greater than its theatrical value alone, but using the actual distribution fees set forth in the distribution agreements. "Deadly Strangers" would have a theatrical value of $23,625 ($225,000 gross receipts less 70% distribution fees, or $67,500, less 65% for note payments), and a value in all media of $30,713 ($23,625 X 1.3%). "The Martyr" would have a theatrical value of $136,500 ($900,000 gross receipts less distribution fees of $510,000 (70% X $200,000, plus 60% X $200,000, plus 50% X $500,000) or $390,000, less 65% for note payments), and a value in all media of $177,450 ($136,500 X 1.3%). Therefore, taking into account the Partnership's obligations to repay the promissory notes, the two movies' aggregate theatrical value would be $160,125 and their value in all media would be $208,163.
29. We find it unnecessary to resolve whether the movies' fair market values to the Partnership should be measured against their purchase prices or the amounts of their notes. See Estate of Baron v. Commissioner,83 T.C. 542, 548 n. 26 (1984), affd. 798 F.2d 65↩ (2d Cir. 1986).
30. Respondent also determined that the Partnership did not receive the amounts of $31,628, $768 and $43, reported as gross receipts on the Partnership's 1976, 1977 and 1979 returns, respectively. Based upon our resolution of the primary issue presented we need not address this specific determination. ↩
31. See sec. 1.183-2(b)(6) and (7), Income Tax Regs.↩
32. The parties have stipulated that the "percentage of distribution method of depreciation" is an acceptable method for financial accounting purposes. Based upon the conclusions reached herein, we need not address petitioners' argument that it also is an allowable method of depreciation for Federal income tax purposes. ↩
33. Petitioners concede that respondent has properly disallowed the investment credits claimed with respect to "Deadly Strangers" and "The Martyr," whose production costs were incurred outside of the United States.↩
34. See n. 5, supra.↩
35. Section 6621 provides in relevant part as follows: SEC. 6621. DETERMINATION OF RATE OF INTEREST. * * * (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000. (3) Tax motivated transactions. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)↩), * * *. 36. Section 6659 provides in relevant part as follows: SEC. 6659. ADDITION TO TAX IN THE CASE OF VALUATION OVERSTATEMENTS FOR PURPOSES OF THE INCOME TAX. * * * (c) Valuation Overstatement Defined. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).↩
37. See sec. 301.6621-2T, Q-5 and A-5, and Q-10 and A-10, Proced. & Admin. Regs. (Temporary), promulgated under sec. 6621(c)(3)(B), for the manner of determining the amount of underpayments attributable to a tax motivated transaction and the effective date for the additional rate of interest. T.D. 7998, 1985-1 C.B. 368↩, 370-372, 49 Fed. Reg. 50390, 50392-50393 (Dec. 28, 1984).